## STATE v. GLEASON

No. 5498. Decided January 11, 1935. (40 P. [2d] 222.)
Rehearing Denied May 23, 1935.

**28**

*J. Vernon Erickson,* of Richfield, for appellant.

*Joseph Chez,* Atty. Gen., and *Zelph S. Calder,* Deputy Atty. Gen., for the State.

FOLLAND, Justice.

Defendant was convicted of subornation of perjury and appeals. The alleged errors relied on for a reversal of the judgment are these: (1) That the evidence was insufficient to support the verdict; (2) that the trial judge erroneously "cross-examined certain witnesses of the defendant as to material and immaterial facts * * * which indicated to the jury the Court's opinion as to the credibility" of the witnesses to the prejudice of defendant; and (3) that the making of certain remarks by the trial judge "to defendant's counsel was prejudicial to the defendant in the minds of the jury."

The record discloses that defendant, an attorney at law practicing in Salt Lake City, was engaged in the conduct of the defense of one Pete Humphries charged with second degree burglary, who was tried in the district court of Salt Lake county commencing on the 16th of September, 1932. The burglary was alleged to have been committed by Humphries in Salt Lake county on or about the 23d day of July, 1932. Grace Royce testified at the Humphries trial, on behalf of the defendant, that she, together with Pete Humphries and certain other young people including her brother Victor, on the 21st of July, 1932, went from Salt Lake City to Fish Lake in Sevier county and stayed at a certain cabin, known as the Neill cabin, continuously from the 21st of July to and including the 26th of July, 1932, and during all that time Pete Humphries was absent from Salt Lake county, Utah.

Victor Royce also testified to the same effect at the Humphries trial. Notwithstanding this attempt to prove an alibi for Humphries, he was convicted by the jury. Grace Royce and Victor Royce were afterwards charged with the crime of perjury, because of their testimony in the Pete Humphries trial and were convicted.

In the present case it is charged that the alibi testimony given at the Humphries trial by Grace Royce was false and untrue, was known by Grace Royce and the defendant John A. Gleason to be false and untrue, and that the defendant "did wilfully, knowingly, unlawfully and feloniously solicit, suborn and procure" Grace Royce to commit the crime of perjury by the giving of such testimony under oath in the Humphries trial. That the alibi story of Grace Royce to the effect that she, Pete Humphries, and the others were at Fish Lake from July 21 to July 26, 1932, was shown to be false and untrue by the testimony of Grace and Victor Royce and also by stipulations of the defendant to the effect that Pete Humphries was not at Fish Lake between the named dates and that the Neill cabin was occupied by persons other than those mentioned by Grace Royce. All elements of the crime were established by sufficient competent evidence, except the charge that the defendant Gleason had procured Grace Royce to give the false testimony and as to that the case rests on the testimony of Grace Royce. The substance of her testimony follows: She is seventeen years of age. She had not known Pete Humphries prior to the day of his trial, but had known his brother Lee Humphries since June of 1932, and had been in his company several times prior to September 15, 1932. On the evening of September 15th, Lee Humphries called at her home and requested that she and her mother, Florence Neill, accompany him to the home of John A. Gleason. They called for a girl named Nina Morley, who joined the party, and then proceeded to the home of Gleason some time after 9 o'clock where she and her mother were introduced to Gleason whom they had never met before. In introducing them Humphries

said, "I brought these people up for witnesses." Gleason asked her if she knew Pete Humphries and she said, "Well I don't know Pete, I have never seen him, I could not identify him I know." He also asked her if she had a cabin at Fish Lake, and she answered, yes that it belonged to her "step dad." Whereupon Gleason said, "We will say you met Pete Humphries on the 18th of July and he came up to see you on the 19th; we will say that he came up to see you and you planned a party for the 24th of July, we will say you went down to Fish Lake on a party on the 21st of July and stayed until the 26th." He took a calendar and showed her what days this would be in July and said, "Now do not get your dates mixed, they are from the 21st to the 26th." The story she was to tell was "that I left home on the morning of the 21st with Victor Royce and Nina Morley and Ike Ernsten and Pete Humphries and myself in a car to go to Fish Lake from Salt Lake, and that we were to return on the night of the 26th. That we could pass the time by going out on the lake and going up to Skougard's to a dance. That he wanted us at Fish Lake, that he wanted me to tell we were at Fish Lake during those days because he wanted it to appear that Pete wasn't in town on those days." She testified Gleason wrote the outlines of the story on a paper and handed it to her. The paper was not produced at the trial. The next day at the Pete Humphries trial she gave evidence under oath of the alibi story outlined above. At the recess of the court, after her cross-examination, Gleason said to her, "I think Thurman knows more about the case than we do; I think he knows more about Fish Lake than we know." This reference was to Allen G. Thurman, who, as assistant district attorney, represented the state in the Pete Humphries trial and had subjected her to cross-examination. It appears that Judge Thurman was at Fish Lake over the 24th of July and had visited with the persons who were in occupancy of the Neill cabin at that place.

Victor Royce testified he gave evidence at the Pete Humphries trial to the effect that he and Pete Humphries and

the other persons named by his sister occupied the Neill cabin at Fish Lake from July 21st to July 26th. Because of such testimony, he had been convicted of perjury and was then serving his sentence in the Utah state prison. He was not at the Gleason home with his sister and the others on the night of the 15th, but the next morning he received from his sister a paper with the outline of the story on it. On cross-examination he testified:

"Q. About eight o'clock that night you talked to Lee Humphries about what your story would be the next day for his brother, didn't you? A. We didn't have a story made up.

"Q. Didn't you say you just talked about your story? A. He was trying to think of a story.

"Q. When did he have it run up? A. The next morning my sister gave me a paper with the outline of the story on it.

"Q. Where is that paper now? A. I don't know."

The defendant, Gleason, took the stand and denied that he had told Grace Royce to testify as she had stated. He said the persons named by Grace and one other, Otto Clegg, had come to him on the night of the 15th of September; that he was told by Grace that Pete Humphries had been with her and others at Fish Lake from the 21st to the 26th of July; and that she would so testify on the morrow.

This testimony was in part corroborated by Otto Clegg who said he was present during the conversation and heard Grace Royce relate the story first to Gleason. Grace Royce and her mother, Mrs. Neill, both testified that Otto Clegg was not present at the Gleason home with them. Mrs. Neill was not examined with respect to what had occurred at the Gleason home. Mrs. John A. Gleason, wife of the defendant, Earl H. Thompson, and Ada Thompson, his wife, all testified they were at the Gleason home in the kitchen during the time Grace Royce and the others were present with Gleason in the front room; that they overheard parts of the conversation, though not all, and had heard Gleason caution Grace against perjury when she at one time mentioned the 4th of July instead of the 24th as the time of the Fish Lake party.

They did not hear him instruct her to testify to the alibi story. Lee Humphries testified he was present during a part of the conversation and did not hear Gleason instruct Grace to testify as she had indicated. Further elaboration of the evidence is unnecessary because, notwithstanding the conflict in the testimony, it was sufficient to go to the jury and support the verdict of guilty unless, as a matter of law, Grace Royce must be corroborated as to the alleged subornation, and further, unless the corroboration of Grace's testimony, if any, is insufficient to connect the defendant with the crime. That the Fish Lake alibi story was concocted by Gleason, and Grace suborned by him to testify to the false alibi, rests alone on the testimony of Grace.

A large part of appellant's brief is devoted to a recitation of the testimony of the defendant with a view of comparing and weighing the evidence and testing the credibility of Grace Royce. With this we are not concerned because credibility of witnesses and weight of the evidence is exclusively for the jury. ■

It is contended by appellant that the evidence as to subornation does not meet the "required quantum of proof" in that she was not corroborated on this point, apparently on the theory that she and Gleason were accomplices under our statute, R. S. Utah 1933, 105-21-24, defining who are principals, and 105-32-18, which provides that:

"A conviction shall not be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself and without the aid of the testimony of the accomplice tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient, if it merely shows the commission of the offense or the circumstances thereof."

The statute, with respect to perjury and subornation of perjury, inter alia, provides:

"Perjury must be proved by the testimony of two witnesses, or one witness and corroborating circumstances." R. S. Utah 1933, 105-21-21.

It will be noted the statute requires two witnesses, or one witness and corroborating circumstances, as to proof of perjury, but it is silent on the subject of whether corroboration is required as to subornation.

In the crime of subornation of perjury, two essential elements are present: (1) The commission of perjury by the person alleged to have been suborned, and (2) a willful procuring or inducing such person to commit perjury by the alleged suborner, he knowing of its falsity. As already seen, the fact that perjury was committed is ■ abundantly proved. It only remains to determine whether the alleged procuring of the witness to testify falsely, with knowledge on the part of the defendant of the falsity of the testimony, may be proved by one witness.

The only cases cited by appellant, in support of the view that the testimony of the person who committed the perjury in a prosecution for subornation is not sufficient unless corroborated, are *People* v. *Evans,* 40 N. Y. 1; *In re Francis,* 1 City H. Rec. 121 (N. Y.). *People* v. *Evans,* supra, was decided in 1869. This decision was bottomed on the statute of New York which made incompetent as a witness a person who had been convicted of perjury. The witness in that case was a self-confessed perjurer but had not then been convicted of the crime. The perjury and the subornation were sought to be proved by the evidence of this witness alone. The court held that while the witness was not incompetent to testify, because not having been convicted, his uncorroborated testimony was insufficient to support a conviction. The case of *In re Francis,* supra, is the record of trial in the court of the General Sessions of the Peace for the city and county of New York in the year 1916. The defendant was charged with subornation of perjury. The jury was instructed that while the rule in cases of perjury requires the falsity of the oath to be proved by at least two witnesses in the case of subornation,

"where the two witnesses, whose oaths are alleged to be false, confess the perjury, the rule applicable to perjury, or the reason for such

■

rule, does not apply. * * * Though the law has pronounced these competent witnesses, the court is bound to say, that it would be wholly unsafe to rely on their testimony unless strongly fortified."

In jurisdictions where, under the recognized rule of evidence, perjury must be proved by two witnesses, or one witness and corroborating circumstances, the same rule extends to proof of the perjury in cases of subornation. *Hammer* v. *United States,* 271 U. S. 620, 46 S. Ct. 603, 70 L. Ed. 1118; *Cohen* v. *United States* (C. C. A.) 27 F. (2d) 713.

The doctrine announced by nearly all state and federal courts, where decisions have been rendered, is, in cases of subornation, that the suborned and the suborner are accomplices as to the perjury and as to that two witnesses are required, or one witness and corroborating circumstances, but as to other elements of the crime such as inducing or procuring the perjury to be committed they are not accomplices, and testimony as to such matters by a person alleged to have been suborned need not be corroborated to sustain a conviction. 21 R. C. L. 276. See note 56 A. L. R. 412.

Probably the leading case on the subject is that of *State* v. *Renswick,* 85 Minn. 19, 88 N. W. 22, wherein it was said:

"The completed crime of subornation of perjury consists of two essential elements,—the commission of perjury by the person suborned, and the willfully procuring or inducing him to so do by the suborner. Gen. St. 1894, § 6379. As to the first element of the crime, the suborned and the suborner are principals by virtue of the statute (Id. § 6310), and necessarily each is the accomplice of the other; hence this element of the crime cannot be established by the uncorroborated evidence of the suborned (Id. § 5767). But as to the second element of the crime, the suborned is neither a principal nor an accomplice, for legally he cannot be guilty of persuading himself to commit perjury. An indictment of a party for inducing himself to commit a crime would be a legal absurdity. *State* v. *Pearce,* 56 Minn. 231, 57 N. W. 652, 1065; *State* v. *Sargent,* 71 Minn. 31, 73 N. W. 626; *State* v. *Durnam,* 73 Minn. 150, 75 N. W. 1127. The conclusion logically follows that if, in the prosecution of a party for subornation of perjury, it is sought to establish the fact that perjury was committed

by the testimony of the person committing it, his testimony must be corroborated as to such fact, because as to the perjury he is an accomplice. But the alleged fact that he was induced to commit the crime by the accused may be established by his uncorroborated testimony if it satisfies the jury beyond a reasonable doubt."

The rule thus announced is approved in both state and federal courts. *Cohen* v. *United States*, supra; *Commonwealth* v. *Douglass*, 5 Metc. (Mass.) 241; *Stone* v. *State*, 118 Ga. 705, 45 S. E. 630, 98 Am. St. Rep. 145; *Bell* v. *State*, 5 Ga. App. 701, 63 S. E. 860; *State* v. *Wilhelm*, 114 Kan. 349, 219 P. 510; *State* v. *Ruskin*, 117 Ohio St. 426, 159 N. E. 568, 56 A. L. R. 403; *State* v. *Smith*, 153 Minn. 167, 190 N. W. 48; *Bradley* v. *Commonwealth*, 245 Ky. 101, 53 S. W. (2d) 215. In at least two jurisdictions the above rule has been followed where they have statutes similar to R. S. Utah 1933, 105-21-24, defining who are principals, where by statute accomplices are required to be corroborated as provided in R. S. Utah 1933, 105-32-18. *State* v. *Renswick* (Minn.) and *State* v. *Stone* (Ga.), supra. In some jurisdictions it is held the suborner and suborned are not accomplices at all, and in a prosecution for subornation of perjury the evidence of one witness, if believed, is sufficient. *Strader* v. *Commonwealth*, 240 Ky. 559, 42 S. W. (2d) 736; *Conn* v. *Commonwealth*, 234 Ky. 153, 27 S. W. (2d) 702; *State* v. *Richardson*, 248 Mo. 563, 154 S. W. 735, 44 L. R. A. (N. S.) 307; *State* v. *White* (Mo. Sup.) 263 S. W. 192; *State* v. *Pratt*, 21 S. D. 305, 112 N. W. 152; *United States* v. *Thompson* (C. C.) 31 F. 331; *Boren* v. *United States* (C. C. A.) 144 F. 801.

New York cases in the lower courts hold that a suborner and suborned are joint principals, and therefore accomplices requiring corroboration under statutes similar to ours. *People* v. *Markan*, 123 Misc. 689, 206 N. Y. S. 197; *People* v. *Martin*, 77 App. Div. 396, 79 N. Y. S. 340; and see, also, *State* v. *Fahey*, 3 Pennewill (Del.) 594, 54 A. 690. This, however, is contrary to the decision of this court in *State* v. *Justesen*, 35 Utah 105, 99 P. 456, wherein it was held (citing headnote) that:

"Perjury and subornation of perjury are separate and distinct offenses, and one charged with subornation of perjury is not an accessory of the one committing the perjury."

We are inclined therefore to follow the cases which hold that as to the subornation charged the evidence of one witness is sufficient to support a verdict where the jury believed beyond a reasonable doubt that the witness has told the truth. The jury, of course, are the sole judges of the weight of the testimony and credibility of the witnesses.

The second ground urged for reversal is that prejudicial error was committed by the trial judge in "cross-examining" certain witnesses for the defendant. No objection is made that the questions asked by the court elicited testimony that was incompetent, irrelevant, or immaterial, or were otherwise improper if such questions had been asked by counsel for either side. The basis of the objection is that the trial judge ought not to have examined the witnesses at all, and that in asking the question the judge indicated an opinion with respect to the credibility of the witnesses examined, or, perhaps, as to the defendant's guilt, all to defendant's prejudice before the jury.

The conduct of a trial is to a large extent under the control and within the discretion of the trial judge who should preside with dignity and impartiality. He is more than a mere referee or moderator. *State* v. *Keehn*, 85 Kan. 765, 118 P. 851. He should not express, or otherwise indicate, an opinion as to the credibility of the witness or the guilt of the defendant. Such matters are exclusively for the jury. The practice is well established for the trial judge, within reasonable bounds, to ask questions of any witness who may be on the stand for the purpose of eliciting the truth, or making clear any points that otherwise would remain obscure. 16 C. J. 831; *People* v. *Reid*, 72 Cal. App. 611, 237 P. 824. It is generally held that in the exercise of his right to question a witness, the judge should not indulge in extensive examination or usurp the function of counsel.

In a criminal case he should not by form of question or manner or extent of examination indicate to the jury his opinion as to the guilt of the defendant or the weight or sufficiency of the evidence. Note 84 A. L. R. 1172; 28 R. C. L. 587. His examination should not be extensive because it is a matter of much difficulty for any person to indulge in an extensive examination of the witness without indicating a train of thought or some feeling with respect to the truth or falsity of the testimony being elicited. His attitude should at all times be fair and impartial so that neither by tone of voice, facial expression, nor manner of propounding a question is bias shown which may prejudice the defendant's right to a fair and impartial trial. A trial judge is within his rights in asking questions for the purpose of eliciting the truth or to clear up an obscurity. *People* v. *Jenkins,* 118 Cal. App. 116, 4 P. (2d) 799. But in doing so, sincerity and fairness should characterize his every word and action.

No question is made with respect to the physical demeanor of the judge. It may be assumed therefore there was not anything objectionable in his expression, inflection of voice, or manner of propounding the questions.

Several witnesses were examined by the judge after counsel for each side had finished their examination, but only in one instance was any objection noted by counsel for defendant, and in this instance objection was not made to the form or subject-matter of the question, but merely to the fact that the court undertook to ask any questions at all. We shall first refer to the incident where the objection was made to the examination by the judge. The witness Myron Scott had been fully examined by both counsel when the following occurred:

"The Court: Let me ask you one question, Mr. Scott, that is not quite clear to my mind.

"Mr. McKnight: (counsel for defendant) Now, may it please your honor, we shall object to the court cross-examining the witness. We consider that it is improper, prejudicial. By reason of the fact of the superior influence and prestige any court has with the jury, we think

it is not fair and proper. The court is an arbitrator and not a partisan.

"The Court: This is not cross-examination. This is just examination. The objection will be overruled.

"Mr. McKnight: Note an exception.

"The Court: Now, Mr. Scott, you say you volunteered the information that she went with Pete Humphries, you volunteered to Mr. McKnight the information that she went with Pete Humphries. What I wanted to know was whether you knew that she went with Pete Humphries, or whether you just thought so? A. I knew because she told me she did.

"The Court: You were not confused as to whether she went with Lee Humphries or Pete Humphries? A. No, because I have met friends of Pete.

"The Court: No, just answer that. A. I know it was Pete."

The "she" mentioned in the questions and answers referred to Grace Royce who had testified that she did not know Pete Humphries. For purpose of laying foundation for impeachment, she had been asked by defense counsel if at a certain time and place she had not said to Myron Scott in words and substance, "Yes, I know Pete Humphries, I have been out with him several times." She denied so saying. Scott was called in impeachment and testified he had such a conversation with Grace Royce. The judge's questions seem to have been propounded in all fairness and sincerity for the purposes of clearing up an obscurity with respect to Scott's statement that "she went with Pete Humphries." The answers removed any uncertainty as to whether the witness was testifying from personal knowledge or merely from what the girl had told him. They were in harmony with his previous testimony and in no way tended to cast doubt on his credibility before the jury. Certainly there was not anything in the questions or the manner of asking them that would indicate to the jury any opinion held by the judge as to the credibility of the witness or guilt of the defendant, or that could in any way prejudice the defendant before the jury.

No objection was made or exception taken to the judge's

examination of the witnesses Mrs. John A. Gleason, Earl H. Thompson, and Lee Humphries. Objection to this conduct on the part of the judge is made for the first time in this court. The state has argued that this court cannot review such objection on appeal since the trial court's attention was not called to the matter by either objection or exception. It is the general rule that "before error can be predicated upon proceedings or incidents of the trial which are deemed objectionable the attention of the trial court must be directed to the matter by proper objections and his ruling obtained thereon." *State* v. *Lanos,* 63 Utah 151, 223 P. 1065, 1067. In that case conduct of the trial judge was not involved, but merely conduct of the district attorney to which no objection had been made at the trial. The above rule is a wholesome one and is generally followed. Nevertheless, we hesitate to say that under no circumstances can or should the appellate court review alleged prejudicial conduct of the trial judge in a criminal case when the objection is made for the first time on appeal. Without definitely passing on that question, it is sufficient for the purpose of this case to say that we have read all the testimony of the witnesses in an endeavor to learn whether there was anything in the questioning by the trial judge which could, in any way, be regarded as an abuse of discretion or prejudice to any substantial right of the defendant. We are of the opinion that no such abuse or prejudice is shown. The questions were fair and the testimony given in response thereto not prejudicial. The practice of questioning by a judge is not to be recommended or encouraged because even with the best of intentions a judge in all sincerity may carry his examination too far and unwittingly prejudice a defendant before the jury. The situation here, however, is far from being one calling for a reversal on the ground that the jury was prejudiced against the defendant by the conduct of the judge. *People* v. *Miller,* 114 Cal. App. 293, 299 P. 742.

Appellant has strongly relied on the case of *State* v. *Freitag,* 53 Idaho 726, 27 P. (2d) 68, where it was held that the

examination of the defendant by the court left the inference the court believed the defendant guilty of the offense charged. That decision, which was by a divided court, places a rather unusual limitation on the right of a trial judge to examine. A comparison of the testimony elicited by the judge in that case with the record before us indicates a clear distinction between the two cases.

That case is also relied on as furnishing support to the view that no objection need be made to the conduct of a trial judge in order to have such conduct reviewed on appeal. The court there based its decision on a statute of Idaho that any "judicial act" in a criminal action occurring before or after judgment shall be deemed excepted to and need not be embraced in the bill of exceptions. The court held the act of the judge in asking questions to be a judicial act which could, by virtue of the statute, be reviewed without objection or exception made or taken at the trial. Since we have no such statute in this state, the decision is not in point.

The third assignment relates to certain remarks by the trial judge to counsel for the defendant claimed by appellant to have been prejudicial. The discussion out of which this assignment arose took place at about 12 o'clock noon. A witness, Earl H. Thompson, had been examined by ■ counsel with respect to a conversation with defendant immediately prior to taking the witness stand. Counsel for the state asked whether the conversation was pertaining to the case. The witness hesitated to state the conversation when the defendant's attorney said, "Just tell what it was." Whereupon he answered that he told the defendant he had gone out and got a witness for him, a Mr. Lee Humphries. The district attorney then asked, "Did you find him? A. Yes sir. Q. Did you bring him? A. Yes sir." At the close of the examination of this witness by defense counsel, the following occurred:

"The Court: Where is the witness, Mr. Thompson? A. He is going to call me at my home. I told him to call me, I would be at home at twelve o'clock. I didn't think, being as late as it was, it would be

necessary for him to go on the stand. He was going to call me at my home when I went home for lunch.

"The Court: Then he is not in the building? A. No, sir.

"The Court: I understood him to say on the stand he was sent out for a witness and brought him in here.

"Mr. McKnight: He didn't say he brought him here. (Record read.)

"The Court: 'Did you find him?' 'Yes.' 'Did you bring him here?' 'Yes.' Now, is he here?

"Mr. McKnight: Let the record show that we take an exception to the language of the court.

"The Court: The court wants to go on with this case, Mr. McKnight and I want to know whether—the witness said on the stand that he brought him and now he says he isn't here.

"Mr. McKnight: We take further exception to the remarks of the court as being prejudicial, in the presence of the jury, and we want the record to show that it is now six minutes after twelve o'clock, and that we are willing to produce the witness here any time within five or ten minutes. We will either produce him at two o'clock, or at this time, if the court insists, within five minutes.

"The Court: You can also let the record show that I waited twenty minutes to get Mr. Thompson here, and at that time I understood you would have your witnesses here.

"Mr. McKnight: Let the record show that we have no means of informing the court just when they would be here, that the witness informed us they would be here at eleven o'clock and we relied upon their statement.

"The Court: Well, there is no disposition to cut you off from any of your witnesses, but we must go on with this case, and we can't just simply let the matter run according to the way counsel thinks it ought to be done."

After further discussion, counsel for defendant said he would have the witness in court in five or ten minutes. Thereupon the following occurred:

"The Court: We will take another short recess.

"Mr. McKnight: I want the record to show that we take an exception to the adjournment, except to two o'clock, at this time. I see no reason why this case should now run over the noon hour in order to force a witness of the defendant in here.

"The Court: This court is running this court room.

"Mr. McKnight: May I complete my record? We take exception to the attitude of the court and to the rulings now made as prejudicial

to the interests of the defendant in this case. (12:10 P. M. Jury admonished; recess.) (12:25 P. M. Court reconvened; all jurors present; defendant personally present.)

"The Court: Have you got your witnesses?

"Mr. McKnight: We have no witness here. I would like to ask the court—I haven't had an opportunity to talk with this witness, and I will ask the indulgence of the court that we adjourn until two o'clock to give me an opportunity—I understand he is a hostile witness. We have done everything to try to get him.

"The Court: Well, in that case I don't see any use of holding the jury any longer during the lunch hour."

Later in the case and before defendant rested, defense counsel asked for an additional recess in order to bring in another witness. Then the following occurred:

"The Court: I recessed at twenty-five minutes of four—it is now four o'clock—for twenty-five minutes. The Ness Building isn't more than three or four blocks away. I have three times, Mr. Erickson, been waiting for witnesses.

"Mr. Erickson: (Counsel for defendant) I think you have been fair.

"The Court: I don't see how I can just keep doing that.

"Mr. Erickson: Go ahead, your honor. The testimony is just practically the same as the brother's. We rest."

As we have already stated, the conduct of the case is largely under the control of the presiding judge who has considerable discretion as to matters of procedure and the expedition of the business of the court. The remarks of the judge were pertinent to the matter in hand; that is, the ordinary progress and the expedition of the trial. The court was merely trying to determine whether the witness was available at that time. After repeating what Mr. Thompson had said about bringing the witness "here," he asked counsel, "Now, is he here?" There had already been some delay because of defendant's witnesses being absent from the court when called to testify. Recess had been taken for the purpose of allowing defendant time in which to bring his witness in court. The witnesses in court had been placed under the rule against speaking with each other as to their testimony given or to be given in the cause and undoubtedly the court

had the right to learn if the witness were present so that he could be placed under the rule even though time might not permit of examination before the noon recess. We think the remarks were justified under the circumstances and the judge did not transgress against the rule. *Almond* v. *People,* 55 Colo. 425, 135 P. 783. That counsel for defendant believed the court had acted fairly is indicated by his remark quoted above. While this remark could not be said to be a withdrawal of the objection and exception to the judge's remarks, and we do not so regard it, it does, however, indicate the court's patience with counsel and counsel's belief that the defense had not been treated unfairly.

The judgment of conviction is affirmed.

EPHRAIM HANSON and MOFFAT, JJ., concur.

ELIAS HANSEN, Justice.

I dissent. Admittedly, if Grace Royce, the witness alleged to have been suborned, is to be regarded as an accomplice within the meaning of R. S. Utah 1933, 105-21-24, the judgment appealed from must be reversed. There is no evidence which in itself, and without the aid of her testimony, tends to connect the defendant with the commission of the charged offense. There are two lines of authority dealing with the question in hand. One line of cases holds that subornation of perjury is a separate and distinct crime from that of the resulting perjury and that a perjurer, who is persuaded to and does commit perjury, is neither a principal nor an accomplice of the one who suborns the commission of perjury. Cases so holding are collected in the prevailing opinion. I readily concede that one who is persuaded to and does commit perjury is not guilty of the crime of subornation of perjury. The converse, however, is not true under a statute such as our R. S. Utah 1933, 103-1-44. If the accused persuaded Grace Royce to commit perjury and by reason of such persuasion she did commit that crime, there is no escape from the conclusion that the accused

was himself guilty of that crime. The provisions of the statute above referred to are clear as to that. The adjudicated cases so hold. *Hammer* v. *U. S.*, 271 U. S. 620, 46 S. Ct. 603, 70 L. Ed. 1118. Had the accused been charged with and tried for perjury, no one would contend that he could lawfully be convicted of such crime upon the uncorroborated testimony of the perjurer, yet the act of persuading her to commit perjury, if she was so persuaded, and the actual commission thereof, are a part of one transaction. Had the information filed against the accused charged him with having committed perjury, the fact, if it be a fact, that he persuaded Grace Royce to testify falsely would have supported such charge. To hold that because the information characterized the acts which the accused is charged with having committed as being subornation of perjury rather than perjury, relieved the state from the necessity of producing corroborative evidence is to turn shadow into substance. The character or the degree of proof required to sustain a conviction of the accused may not be said to hang upon so frail a thread as the mere fact that the acts complained of are labeled subornation of perjury rather than perjury. It is evident that the reason for the legislative provisions prohibiting the conviction of an accused upon the uncorroborated testimony of an accomplice is that such testimony is not entitled to full credit. Obviously, the reliability of such testimony would neither be weakened nor strengthened by the nature of the charge filed against the accused; that is, whether the charge be perjury or subornation of perjury. In either event, the perjurer has the same motive for attempting to place a part or the whole blame for her crime upon another. The fact that upon the alleged acts the accused may properly be charged with either perjury or subornation of perjury is a mere incident, but the fact that the prosecuting witness was particeps criminis in the acts relied upon by the state to sustain the conviction here under review is of the very essence of the basis for the statutory requirement that a lawful conviction may not be

had upon her uncorroborated evidence. Among the cases from other jurisdictions so holding are: *People* v. *Coffey*, 161 Cal. 433, 119 P. 901, 907, 39 L. R. A. (N. S.) 704; *People* v. *Markan*, 123 Misc. 689, 206 N. Y. S. 197; *People* v. *Martin*, 77 App. Div. 396, 79 N. Y. S. 340. Such is the uniform holding of this court. *State* v. *Wade*, 66 Utah 267, 241 P. 838; *State* v. *Coroles*, 74 Utah 94, 277 P. 203. In those cases it was held, quoting from the case of *People* v. *Coffey*, supra, that the true test is that, "if in any crime the participation of an individual has been criminally corrupt, he is an accomplice. If it has not been criminally corrupt, he is not an accomplice." It cannot be successfully maintained that Grace Royce was not criminally corrupt in the crime under review.

The law requiring corroboration of an accomplice is especially applicable to a case where a conviction is sought upon the uncorroborated evidence of a perjurer. It may be argued with plausibility that the mere fact that one has participated in a crime not involving a lack of veracity does not necessarily indicate that such person is unworthy of belief, but not so where the state relies upon the testimony of a perjurer for a conviction. In the latter case the state cannot vouch for the veracity of its witness, but, on the contrary, it must establish as a part of its case the fact that such witness is a perjurer.

Upon principle, as well as upon the authority of the cases from this and other jurisdictions heretofore cited, I am of the opinion that the judgment should be reversed and a new trial granted.

STRAUP, Chief Justice.

I concur in the dissent. The person committing perjury and the person suborning the commission of it are both directly connected with and involved in the same criminal and unlawful act, both participating and uniting in the commission of a crime growing out of the same transaction, and, under the statute, both indictable and punishable. For

further views entertained by me on the question of an accomplice, I refer to that portion of my concurring opinion on such question or subject in the case of *State of Utah* v. *Cragun,* filed December 14, 1934 (Utah) 38 P. (2d) 1071.